IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BARK, an Oregon nonprofit corporation,

        Plaintiff,

    v.

UNITED STATES FOREST SERVICE,

        Defendant.

No. CV 04-356-MO

OPINION AND ORDER

**MOSMAN, J.,**

    Bark brings this action alleging that the United States Forest Service ("USFS") violated the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., in developing and approving the Slinky Timber Sale in the Mt. Hood National Forest.  The matters now before the court are Bark's Motion for Summary Judgment and Injunctive Relief (#15), and the USFS's Cross-Motion

PAGE 1 - OPINION AND ORDER

for Summary Judgment (#48).

Bark's NFMA claim requires the court to determine which NFMA planning regulations apply to the Slinky Timber Sale, the 1982 planning regulations, the 2000 transitional rule, or the 2005 planning regulations. The court holds that the 2000 transitional rule applies and that the USFS failed to justify the timber sale under that rule. Bark's motion for summary judgment on its NFMA claim is therefore GRANTED. The court DENIES Bark's motion for summary judgment on its NEPA claim. The USFS took the requisite hard look at the potential environmental consequences of the Slinky Timber Sale. Accordingly, the USFS's cross-motion is DENIED on Bark's NFMA claim and is GRANTED on Bark's NEPA claim.

BACKGROUND

I.    Statutory and Regulatory Framework

A.    NFMA Requirements

The NFMA provides the statutory framework for the management of national forests, and imposes a duty on the USFS to balance the demands on national forests, including timber sales, recreational use, and environmental preservation, to ensure the continued diversity of plant and animal communities. 16 U.S.C. § 1604(a), (g)(3)(B); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). The NFMA involves two levels of forest planning. *Id.* At the first level, the USFS is required to create a comprehensive land and resource management plan ("LRMP") or forest plan for each national forest. *The Lands Council v. Powell*, 395 F.3d 1019, 1032-33 (9th Cir. 2005). The LRMP governs land management activities in that forest. 16 U.S.C. § 1604(a). At the second level, implementation of the LRMP occurs through site-specific projects. *Native Ecosys. Council v. Dombeck*, 304 F.3d 886, 897

PAGE 2 - OPINION AND ORDER

(9th Cir. 2002). All site-specific projects, including timber sales, must be determined to be consistent with the LRMP created at the first level. *Id.* (citing 16 U.S.C. § 1604(i)); *The Lands Council*, 395 F.3d at 1033.

Before a forest plan may be adopted, the NFMA requires the Secretary of Agriculture to issue regulations that: (1) set forth the process for the development and revision of plans within the national forests; and (2) establish management planning standards and guidelines. 47 Fed. Reg. 43026, 43037 (Sept. 30 1982). The NFMA planning regulations were originally adopted in 1979 and were revised in 1982, codified at 36 C.F.R. § 219 (1982). *Id.* The 1982 planning regulations ("82 Regs") govern USFS management at both the LRMP and site-specific project levels. *Id.* Specifically, the 82 Regs require the USFS to monitor the populations of certain management indicator species[1] ("MIS") and to determine relationships to habitat changes at both levels. 36 C.F.R. § 219.19(a)(6).

In November 2000, the 1982 regulations were supplanted by the 2000 regulations ("00 Regs"), codified at 36 C.F.R. § 219 (2001). *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 800 n.3 (9th Cir. 2005); 65 Fed. Reg. 67514-82 (Nov. 9, 2000). The 00 Regs contained substantive regulations as well as a transitional rule that began on November 9, 2000. *Id.* at 67579. Under that transitional rule ("2000 transitional rule"), the USFS is required to consider the best available science when implementing a forest plan. *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 744 (10th Cir. 2006) ("*UEC III*"); 36 C.F.R. § 219.35(a), (d) (2001).

---

[1]MIS are bellwether species used to monitor the effects of management decisions on other species with similar habitat needs and population characteristics. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 762 n.11 (9th Cir. 1996).

In 2004, the Department of Agriculture issued an interpretive rule clarifying the effect of the 2000 transitional rule. 69 Fed. Reg. 58055 (Sept. 29, 2004). The interpretive rule explains:

> [u]ntil a new final rule is promulgated, the transition provisions of § 219.35 remain in effect. The 1982 rule is not in effect. During the transition period, responsible officials may use the provisions of the 1982 rule to prepare plan amendments and revisions. Projects implementing land management plans must comply with the transition provisions of § 219.35, but not any other provisions of the 2000 planning rule. Projects implementing land management plans and plan amendments, as appropriate, must be developed considering the best available science in accordance with § 219.35(a). Projects implementing land management plans must be consistent with the provisions of the governing plan.

*Id.* at 58057. The interpretive rule further provides "the [82 Regs] may continue to be used only for plan amendments and revisions upon election of the responsible official. Appropriate plan amendments and projects proposed during the transition period should be developed considering the best available science in accordance with § 219.35 paragraph (a)." *Id.* at 58056.

The 2000 transitional rule was terminated when new substantive regulations, the 2005 planning regulations ("05 Regs"), were implemented, codified at 36 C.F.R. § 219 (2005). 70 Fed. Reg. 1022 (Jan. 5, 2005). Under the 05 Regs, the USFS is required to take into account the best available science by documenting how that science was used in the planning process, including evaluations and disclosures of any substantial uncertainties and risks in that science. 36 C.F.R. § 219.11(a). MIS population monitoring is only required if the forest plan or LRMP so specifies. 36 C.F.R. § 219.14(f). Moreover, site-specific monitoring of a proposed project is not required. *Id.*

B.    NEPA Procedural Requirements

NEPA requires federal agencies to prepare an environmental impact statement ("EIS")

whenever they propose to undertake any major federal action "significantly affecting the quality

of the human environment."  42 U.S.C. § 4332(c).  "The goal of NEPA is twofold:  (1) to ensure

the agency will have detailed information on significant environmental impacts when it makes its

decisions; and (2) to guarantee that this information will be available to a larger audience."

*Inland Empire*, 88 F.3d at 758.  Unlike the NFMA, NEPA imposes no substantive requirements

and exists only to ensure agencies publicly consider the environmental impacts of their actions

before going forward.  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 963

(9th Cir. 2002).  In other words, NEPA ensures a process and not any particular results.  *Inland

Empire*, 88 F.3d at 758.

　　　　Under NEPA, the threshold question is whether a proposed project will significantly

affect the environment, thereby triggering the requirement for an EIS.  *Blue Mountains

Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).  If an agency determines

on the basis of an environmental assessment ("EA") not to prepare an EIS, the agency must

prepare a finding of no significant impact ("FONSI") to explain why the action will not have a

significant impact on the environment.  *Id.*  NEPA regulations and case law require disclosure of

all foreseeable direct and indirect impacts.  40 C.F.R. § 1502.16; *City of Davis v. Coleman*, 521

F.2d 661, 676 (9th Cir. 1975).  To show the agency violated its statutory duty to prepare an EIS, a

plaintiff only need raise substantial questions whether a project may have a significant effect on

the environment.  *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1149-50 (9th Cir. 1998).

II.　　　Slinky Timber Sale

　　　　In 1998, the USFS proposed a timber management project, the Slinky Timber Sale,

within the Mt. Hood National Forest.  The Slinky Timber Sale proposes to log 184 acres of forest

from the Oak Grove Fork and Upper Clackamas watersheds. In 2003, the Slinky EA was released, and on September 29, 2003, the decision notice ("DN") to implement the Slinky Timber Sale was signed and a FONSI was issued. On December 29, 2003, the USFS denied Bark's administrative appeal. Subsequently, on December 2, 2004, Bark filed this action for judicial review of the USFS's final agency action under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706.

Bark alleges the USFS violated the NFMA by failing to ensure the viability of certain MIS[2] by not following the Mt. Hood LRMP's and the Northwest Forest Plan's ("NFP") MIS monitoring requirements. Bark also alleges the USFS violated NEPA by failing to: (1) address, analyze, and disclose the impact of the Slinky Timber Sale on wildlife and the environment; and (2) analyze the impact of the Slinky Timber Sale in connection with past timber sales and other activities in the project area.

Bark seeks to enjoin the USFS from implementing the Slinky Timber Sale until it demonstrates that the sale complies with NEPA and the NFMA. Additionally, Bark moves this court for an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

In its cross-motion for summary judgment, the USFS counters that: (1) it did not have a duty to monitor for MIS under the NFMA, or, alternatively, it met its duty to monitor for MIS; and (2) it took the necessary hard look at the potential environmental consequences as required by NEPA. Bark has since filed a motion to strike Exhibit A of the USFS's cross-motion for summary judgment.

---

[2]The MIS at issue in this case are pine marten, pileated woodpeckers, deer, and elk.

PAGE 6 - OPINION AND ORDER

STANDARDS OF REVIEW

I.    Summary Judgment

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Claims brought pursuant to the NFMA and NEPA are reviewed under the APA and may be resolved through motions for summary judgment.  *Rittenhouse*, 305 F.3d at 964; *NW Motorcycle Ass'n v. U.S. Dept. of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994).  Under the APA, the court reviews the challenged agency action under a narrow and deferential standard to determine whether such action was arbitrary and capricious.  5 U.S.C. § 706(2)(A); *Friends of the Earth v. Hintz*, 800 F.2d 822, 830 (9th Cir. 1986).  The court's review is generally limited to the agency's administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).  A challenged agency action will be upheld so long as the agency based its decision on consideration of the relevant factors and avoided making a clear error of judgment.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).  The court may not substitute its judgment for that of the agency.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (abrogated on other grounds).

II.    Injunctive Relief

The basis for injunctive relief is irreparable injury and the inadequacy of legal remedies. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).  In each case, the court must balance the competing claims of injury and must consider the effect of granting or denying the requested relief on each party.  *Id.*  Although a court cannot presume an irreparable injury based on ostensible NEPA violations, when environmental injury is sufficiently likely, the balance of

harms will usually favor the issuance of an injunction to protect the environment. *Id.* at 545.

The proper remedy for substantial procedural violations of NEPA is an injunction. *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1129 (9th Cir. 1998).

DISCUSSION

I.    Cross-Motions for Summary Judgment

    A.    Bark's NFMA Claim

As an initial matter, the court rejects the USFS's argument that Bark's NFMA claim is not justiciable. Bark does not, as the USFS argues, merely challenge the act of failing to monitor for MIS instead of a final agency action. Rather, Bark challenges the Slinky Timber Sale as a final agency action on the grounds that the USFS failed to monitor for MIS as required by the NFMA and forest plans. *See Thomas*, 137 F.3d at 1153-54 (challenge of the USFS's failure to monitor for MIS as required by the NFMA and applicable forest plan is justiciable).

At the heart of Bark's NFMA claim is the USFS's duty to monitor for MIS. As previously noted, that duty is governed by the NFMA planning regulations, and the parties dispute which regulations apply to the project at issue, the Slinky Timber Sale. Bark argues the 82 Regs apply because the governing LRMP, Mt. Hood LRMP (1990), and Forest Plan, NFP (1994), were approved when the 82 Regs were in effect and because they incorporate the 82 Regs. The USFS contends the court should apply the 05 Regs or, alternatively, the 2000 transitional rule.

        1.    Which NFMA Planning Regulations Apply?

The court holds the applicable NFMA planning regulation is the 2000 transitional rule. This determination is made without the benefit of directly controlling Ninth Circuit case law on

this issue.[3]  As such, the court's analysis is primarily guided by the plain meaning of the 2000

transitional rule and of the USFS's 2004 interpretive rule, as well as an examination of case law

from sister circuits that address this issue.[4]

    The text of the 2000 transitional rule provides that "[d]uring the transition period, the

responsible official *must* use the best available science in *implementing* . . . the current plan."[5]

---

[3]Generally, the Ninth Circuit's determination of the applicable NFMA planning regulations has been relegated to footnotes.  *See, e.g.*, *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1017 n.8 (9th Cir. 2006) ("*EPIC*") (applied 82 Regs because USFS conceded it was required to comply with the regulations and forest plan in place at the time of its decision); *Native Ecosys. Council v. U.S. Forest* Serv., 428 F.3d 1233, 1237 n.5 (9th Cir. 2005) (applied 82 Regs to a project approved after Dec. 2000); *Natural Res. Def. Council*, 421 F.3d at 800 n.3 (applied 82 Regs to an LRMP revision approved in 1997 because 82 Regs were in effect when the plan revisions challenged in the lawsuit were prepared).

[4]The 2004 interpretive rule is entitled to a high degree of deference.  *See Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1218 (9th Cir. 2002) (an agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld so long as it is not plainly erroneous or inconsistent with the regulation).

[5]The relevant language governing the 2000 transitional rule is found at 36 C.F.R. § 219.35(a)-(d) (2001):
    (a) The transition period begins on November 9, 2000 and ends upon the completion of the revision process (§ 219.9) for each unit of the National Forest System.  During the transition period, the responsible official must consider the best available science when implementing and, if appropriate, amending the current plan.
    (b) Until May 9, 2002, a responsible official may elect to continue or to initiate new plan amendments or revisions under the 1982 planning regulations in effect prior to November 9, 2000 (See 36 CFR parts 200 to 299, Revised as of July 1, 2000), or the responsible official may conduct the amendment or revision process in conformance with the provisions of this subpart. For the purposes of this paragraph, the reference to a plan amendment or revision initiated before May 9, 2002, means that the agency has issued a Notice of Intent or other public notification announcing the commencement of a plan amendment or revision as provided for in the Council on Environmental Quality regulations at 40 CFR 1501.7 or in Forest Service Handbook 1909.15, Environmental Policy and Procedures Handbook, section 11.
    (c) If a review of the lands not suited for timber production is required before the completion of the revision process, the review must take place as described by the provisions of § 219.28, except as provided in paragraph (b) of this section.

30 C.F.R. § 219.35(a) (emphasis added).  The 2004 interpretive rule confirms this requirement, stating that "projects proposed during the transition period should be developed considering the best available science."  69 Fed. Reg. 58056.  The interpretive rule also provides the 82 Regs are no longer applicable for projects proposed during the transition period.  *Id.* at 58057.

In *UEC III*, the Tenth Circuit likewise looked to the plain meaning of the 2000 transitional rule and of the 2004 interpretative rule to determine which NFMA planning regulations applied to a 123-acre timber thinning project approved in 2004, a time during the transition period.  443 F.3d at 745-46.  As part of its plain-meaning analysis, the *UEC III* court distinguished between the USFS's use of terms used to define forest plans generally from those used to define site-specific projects implemented under a forest plan.  *Id.*  The court explained that the UFSF's use of the term "plan," as in "plan amendments and revisions," refers to forest plans generally.  *Id.*  The USFS's use of the terms "project" or "implementing the plan" refers to individual or site-specific projects.  *Id.*  The court found this distinction crucial because the 2000 transitional rule endorses different standards for forest plans generally and individual or site-specific projects in particular.  *Id.* at 746-47

In holding that the 2000 transitional rule applied, the court reasoned that the 82 Regs had been supplanted and that the project at issue had been approved during the transition period, requiring the USFS to apply the 2000 transitional rule.  *Id.* at 745-47.  Similarly, in *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1191-92 (10th Cir. 2006), that court held that the 2000 transitional rule applied to a site-specific project approved during the transition period in 2003.

―――――――――――――――

(d) Site-specific decisions made by the responsible official 3 years from the November 9, 2000 and afterward must be in conformance with the provisions of this subpart.

*Id.*  The *Ecology Ctr.* court reasoned that although the governing LRMP was adopted in 1986, *id.* at 1185, the 2000 transitional rule superceded the 82 Regs, requiring the USFS to apply the 2000 transitional rule to site-specific projects approved during the transition period.  *Id.* at 1190.

This rationale falls in line with what several district courts within this Circuit hold as governing Ninth Circuit case law.  Those courts hold that under the law of this Circuit, the applicable NFMA planning regulations are those in effect at the time the decision challenged in the lawsuit was prepared.  *See, e.g., Alliance For the Wild Rockies, et. al. v. Kimbell*, 2006 WL 2830175, at *7 (D. Mont. Sept. 29, 2006) ("It is clear that this Court must [ ] apply the regulations in effect at the time of the [USFS's] decision approving the Project."); *Defenders of Wildlife v. Johanns*, 2005 WL 2620564, at *7 (N.D. Cal. Oct. 14, 2005) (the court applies the NFMA planning regulations in effect at the time the plan revisions challenged in the lawsuit were prepared); *League of Wilderness Defenders-Blue Mountain Biodiversity Project v. Bosworth*, 383 F. Supp. 2d 1285, 1303 (D. Or. 2005) ("*LOWD*") (when reviewing under the APA, the court uses the regulations in effect at the time of the challenged decision).  Also of significant importance, the Tenth Circuit has similarly construed Ninth Circuit case law.  *UEC III*, 443 F.3d at 745 (construing footnote three in *Natural Res. Def. Council*, 421 F.3d at 800, as holding that the applicable NFMA regulations are those in effect at the time the plan revisions challenged in the lawsuit were prepared).

As applied to this case, the Slinky Timber Sale was approved during the transition period in 2003, a time when the 82 Regs had been supplanted and the 05 Regs were yet to be promulgated.  The 82 and 05 Regs, therefore, were not in effect at the time the Slinky Timber Sale, the challenged decision, was approved and, as such, they do not apply in this case.

PAGE 11 - OPINION AND ORDER

Moreover, neither the Mt. Hood LRMP nor the NFP explicitly require that the USFS comply with the monitoring requirements of the 82 Regs.  Thus, the applicable NFMA planning regulation is the 2000 transitional rule, which requires the USFS to implement the Slinky Timber Sale according to the best available science.  *See UEC III,* 443 F.3d at 745-47; 36 C.F.R. § 219.35.

However, the application of the 2000 transitional rule to Slinky Timber Sale does not alleviate the USFS of its duty to monitor for MIS.  The NFMA still requires that projects be consistent with the governing LRMP or Forest plan.  *See* 16 U.S.C. § 1604(i); *The Lands Council*, 395 F.3d at 1032-33; *Inland Empire*, 88 F.3d at 760 n.6.  Here, the forest plans envision some form of monitoring for MIS, which neither party disputes.  As such, the court must determine whether the USFS followed the best available science in a manner consistent with its obligations under the Mt. Hood LRMP and the NFP.  *See Kimbell*, 2006 WL 8830175 at *8; *LOWD*, 383 F. Supp. 2d at 1303.

>    2.    Did the USFS Follow the Best Available Science Consistent with the Mt.
>          Hood LRMP and the NFP?

Although the USFS was obligated to implement the Slinky Timber Sale according to the "best available science" under the 2000 transitional rule, the Slinky EA, DN, and FONSI show that the USFS failed to consider or even mention that standard during the administrative process. Simply put, the 2000 transitional rule provided the USFS with the appropriate standard, and it failed to apply that standard or anything like it.  The administrative record lacks any explanation or definition of the "best available science" as well as what, if anything, satisfies this burden. The Second and Tenth Circuits recently addressed this issue.

PAGE 12 - OPINION AND ORDER

The Second Circuit in *Forest Watch v. U.S. Forest Serv.*, 410 F.3d 115, 119 (2005), determined that the 2000 transitional rule applied to an EA issued in 2002.  The court found that the USFS nowhere considered or even mentioned the 2000 transitional rule's best available science standard during the administrative process.  *Id.*  It held that this failure amounted to conduct that was arbitrary and capricious and remanded the case to the district court with an order to vacate the USFS's approval of the project.  *Id.*  The Tenth Circuit followed *Forest Watch's* rationale and vacated the USFS's approval of a project approved during the transition period where the USFS also failed to mention its compliance with the transitional rule's standard. *Ecology Ctr.*, 451 F.3d at 1195.

Accordingly, the court finds that the USFS's failure to consider the 2000 transitional rule's standard in implementing the Slinky Timber Sale was arbitrary and capricious.  The court cannot affirm the USFS's action on grounds which it did not consider.  *See id.* at 1195; *Forest Watch*, 410 F.3d at 119.  Moreover, the court cannot adjudge the more narrow question of whether the USFS met its monitoring obligations under the respective forest plans when it cannot determine whether the USFS implemented the Slinky Timber Sale according to the best available science. *Id.*  The USFS's approval of the Slinky Timber Sale is therefore VACATED.  Bark's motion for summary judgment as to its NFMA claims is GRANTED.  The USFS's cross-motion as to those claims is therefore DENIED.

B.      Bark's NEPA Claim

Bark alleges the USFS violated NEPA by failing to (1) analyze and disclose the impact of the Slinky Timber Sale on the four MIS and the northern spotted owl, and (2) analyze the cumulative impacts of the proposed Slinky Timber Sale on past, present, and reasonably

foreseeable actions in the planning area.  Bark argues the USFS was required to prepare an EIS.
The USFS responds that it took the required hard look at the potential environmental
consequences of the Slinky Timber Sale.  The court agrees with the USFS.

    1.        The Four MIS and the Northern Spotted Owl

According to the Slinky EA, the USFS examined the direct, indirect and cumulative
effects of the proposed Slinky Timber sale on the four MIS.  AR 780-87, 790-98, 842.[6]  The
USFS discussed the potential impact of the timber sale on these species in detail, including its
effect on the habitat of the MIS.  *Id.*  NEPA only ensures that the USFS takes a hard look at the
environmental impact of the Slinky Timber Sale; it does not place the substantive MIS
monitoring requirement of the NFMA on the USFS.  *See Rittenhouse,* 305 F.3d at 963; *Inland
Empire*, 88 F.3d at 757-58.

Regarding the northern spotted owl, the Slinky EA and the FONSI specify that the Slinky
Timber Sale would have no significant impact.  AR 745, 786.  While the EA and the FONSI do
disclose some impact and some risk, the ultimate conclusion is that the timber sale is not likely to
jeopardize the continued existence of the northern spotted owl or result in the destruction or
adverse modification of its crucial habitat.  AR 745, 786-88, 850, 854.  The mere disclosure of
some negative impact does not itself require the preparation of an EIS.  *Native Ecosys.*, 428 F.3d
at 1240-41 (a hard look involves a discussion of adverse impacts, and the presence of some
negative effects does not necessarily rise to the level of demonstrating a significant effect on the
environment).

_____

   [6]"AR" refers to the administrative record lodged with the court.

PAGE 14 - OPINION AND ORDER

Bark also argues the USFS's decision regarding the northern spotted owl is incorrect because it relied on a Biological Opinion ("BO") that was invalidated in another case.[7]  Bark's argument is misguided.  While the BO was invalidated, the USFS does not rely on the BO for the basis of its decision.  The USFS merely cites one sentence from the BO amid its own cumulative impacts analysis.  AR 852.

Accordingly, the USFS took the required hard look at the potential environmental consequences for the MIS and the northern spotted owl, and its issuance of a FONSI was not arbitrary and capricious

_____2.    Cumulative Impacts

The USFS is only required to analyze a proposed project's cumulative impacts if any past, present, and reasonably foreseeable actions are connected, cumulative, or similar.  40 C.F.R. § 1508.25.  Absent such, there is no requirement that any other actions be addressed in the EA or EIS.  *Id.*  Connected actions are defined as those which: "(i) [a]utomatically trigger other actions which may require environmental impact statements; (ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously; or (iii) are interdependent parts of a larger action and depend on a larger action for their justification."  40 C.F.R. § 1508.25(a)(1).

Cumulative actions are those actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).  Similar actions are those which "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for

_____

[7]The BO is an opinion issued by the USFS on the effects of the Slinky Timber Sale as well as many other projects.  AR at 852.  The BO is entitled Willamette Province Fiscal Year 1999 Habitat Modification Biological Opinion for Listed Species.

PAGE 15 - OPINION AND ORDER

evaluating their environmental consequences together, such as common timing or geography."

40 C.F.R. § 1508.25(a)(3).

Here, the EA discusses the cumulative impacts of several past timber sales in the project

area, as well as the impact on snags, fish and water, and air quality.  AR 782-814.  The EA also

lists several past, concurrent, and foreseeable projects by name, including their impacts, current

or potential.  AR 772, 773, 782, 789, 795, 797, 805.  Contrary to Bark's assertions, the USFS is

not required to consider actions that are not reasonably anticipated to have a cumulatively

significant impact on the environment.  40 C.F.R. § 1508.27(b)(7).  The court therefore finds the

USFS took a hard look at the cumulative effects of any past, present, and foreseeable actions

within the project areas.  The USFS's decision not to issue an EIS was not arbitrary and

capricious.

Accordingly, Bark's motion for summary judgment on its NEPA claim is DENIED.  The

USFS's cross-motion as to these claims is GRANTED.

C.    Bark's Motion for Costs and Attorney Fees

Bark also moves this court for an award of costs and attorneys' fees under the EAJA.

However, Bark has not provided any substantive grounds for the award of costs and fees under

the EAJA.  That motion is therefore DENIED.

II.    Bark's Motion to Strike

Bark also moves this court (#54) to strike Exhibit A, a memorandum issued by the

Chairman of the Council on Environmental Quality ("CEQ"), of the USFS's cross-motion for

summary judgment.  The CEQ memorandum provides federal agencies with guidance on their

duty to analyze the environmental effects of past actions when describing the cumulative effect

PAGE 16 - OPINION AND ORDER

of a proposed action in accordance with § 102 of NEPA, 42 U.S.C. § 4332, and the CEQ

regulations for implementing the procedural provisions of NEPA, 40 C.F.R. §§ 1500-1508.  It

instructs that a review of past actions, as part of the environmental analysis under NEPA, is

required to the extent that the review informs agency decision-making regarding proposed

actions.

Bark argues the CEQ memorandum, Exhibit A, is an improper post hoc rationalization

used to defend the USFS's approval of the Slinky Timber Sale because it was issued after

approval of the sale.  The court disagrees and DENIES the motion to strike.

Judicial review of a final agency action is generally limited to examination of the

administrative record as it existed when the agency made the relevant decision.  *Friends of the*

*Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).  An agency may not rely on "post

hoc rationalizations" to defend its earlier decisions.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S.

204, 212 (1988).  Review may, however, be expanded beyond the record to explain agency

decisions.  *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988).  Material outside

the record is permitted: (1) if it is necessary to determine "whether the  agency has considered all

relevant factors and has explained its decision;" (2) "when the agency has relied on documents

not in the record;" or (3) "when supplementing the record is necessary to explain technical terms

or complex subject matter."  *Inland Empire Public Lands Council v. Glickman*, 88 F.3d 697,

703-04 (9th Cir. 1996) (quoting *Friends of the Payette v. Horshoe Bend Hydroelec. Co.*, 988

F.2d 989, 997 (9th Cir. 1993)).

Here, the USFS does not offer Exhibit A to advance a new argument or as a post hoc

rationalization of its decision to approve the Slinky Timber Sale.  Rather, Exhibit A is offered to

PAGE 17 - OPINION AND ORDER

show that the USFS's understanding and application of the cumulative impact analysis required by NEPA is consistent with that of CEQ's.  Moreover, Exhibit A shows that the USFS had considered all relevant factors in its cumulative impact analysis and is helpful in explaining the proper application of that analysis under NEPA, a complex subject matter.

CONCLUSION

Based on the foregoing, Bark's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Bark's motion is GRANTED as to its NFMA claim and DENIED as to its NEPA claim.  The USFS's cross-motion is therefore DENIED as to Bark's NFMA claim and GRANTED as to Bark's NEPA claim.  As such, the USFS is enjoined from implementing the Slinky Timber Sale until it can show it complies with the NFMA.  Bark's motion to strike and its motion for fees and costs are DENIED.

IT IS SO ORDERED.

DATED this  3rd  day of March, 2007.


/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
United States District Court

PAGE 18 - OPINION AND ORDER